UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
THE ERNEST LAWRENCE GROUP and
LAWRENCE BAILIN,

               Plaintiffs,

                           03 Civ. 1510 (PKC)

     -against-

                           MEMORANDUM
                           <u>AND ORDER</u>

MARKETING THE AMERICAS, INC.;
NEPS, INC.; DENNIS VAUGHAN a/k/a
DENNIS W. VAUGHN, III; and GOLD,
MELTZER, PLASKY AND WISE, P.A.,

               Defendants.

-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        This action arises in the aftermath of a failed business known as United States Careers Center ("USCC") in which plaintiff Lawrence Bailin and defendant Dennis Vaughan, who is currently serving time in federal prison, were co-investors. Bailin is also a part owner of plaintiff The Ernest Lawrence Group ("TELG"), a firm that provided advertising services to USCC.

        The present motions for summary judgment focus on the conduct of defendant Gold, Meltzer, Plasky and Wise, P.A. (the "Gold Firm"), a firm of certified public accountants. In the past, the Gold Firm had done accounting work for both Vaughan and USCC. No claims in this litigation are asserted on behalf of Vaughan or USCC. Plaintiffs assert six claims against the defendant Gold Firm: fraud, breach of contract, breach of fiduciary duty, constructive fraud, negligent misrepresentation and professional negligence.

Plaintiffs commenced this action on March 5, 2003. Plaintiff Bailin resides in and is a citizen of New York. (First Am. Compl. ("FAC") ¶ 2) Plaintiff TELG is a corporation organized under the laws of New York, with its principal place of business in New York. (FAC ¶ 1) The Gold Firm is a "professional association" with offices in Pennsylvania and New Jersey. (FAC ¶ 7) None of the members of the professional association are citizens of New York. (FAC ¶ 8; Answer to FAC ¶¶ 1-2) Subject matter jurisdiction exists by reason of diversity of citizenship and an amount in controversy in excess of the jurisdictional threshold. 28 U.S.C. § 1332.

Discovery is now closed. Defendant Gold Firm has moved for summary judgment on all of plaintiffs' claims, and plaintiffs oppose defendant's motion and have offered their own motion for summary judgment. For each claim, I have considered all evidence in the record, whether submitted in support or in opposition to defendant's motion or plaintiffs' motion. Drawing all reasonable inferences in favor of plaintiffs, I conclude that no reasonable jury could find in their favor on any of the claims. Defendant Gold Firm is entitled to summary judgment dismissing all six claims.

Facts

For the purpose of these motions, I have accepted as true plaintiffs' version of the facts and such other facts offered by defendant Gold Firm that are not disputed by plaintiffs. Plaintiff Bailin is the part owner of plaintiff TELG, an advertising firm. (Bailin Dep. at 6, 17) Bailin first met defendant Vaughan in either late 1998 or early 1999 as a result of their mutual involvement with a Manhattan-based business called Government Careers Center ("GCC"). (Bailin Dep. at 39) GCC trained candidates for low-level civil service jobs. (Bailin Dep. at 31-32) At that time, TELG placed advertisements for GCC in New York and for its affiliates around the country. (Bailin Dep. at 50-51) Vaughan was the 100% owner of Government Ca-

reers Center of Philadelphia ("GCC-Philadelphia").  (Bailin Dep. at 40)  Vaughan first contacted

Bailin in late 1998 or early 1999 to inquire about TELG placing advertisements for GCC-

Philadelphia.  (Bailin Dep. at 43)

Unbeknownst to Bailin, on January 7, 1998, the United States District Court for

the District of Kansas permanently enjoined Vaughan from "advertising, promoting or selling

any franchise or business venture".  (Pl. Ex. W)  The order was entered on consent.  See United

States v. Vaughan, 2001 WL 1526274, *2 (D. Kan. Oct. 18, 2001) (discussing factual back-

ground).  It was the outgrowth of an FTC investigation into Vaughan's activities with two Kan-

sas-based businesses known as Parade of Toys, Inc. and Wonderful World of Toys, Inc.  See id.,

at *1-*2.  The FTC alleged that Vaughan and his associates had engaged in fraudulent telemar-

keting scams resulting in losses to consumers in excess of $50 million.  (Def. Ex. K)

In 1999, Bailin and TELG brought an action against GCC-New York for the non-

payment of $200,000 of services.  (Bailin Dep. at 53-55)  Plaintiffs prevailed in the action, and

the court appointed TELG as the receiver of GCC-New York.  (Bailin Dep. at 55-56)  Plaintiffs

changed the name of the business to National Civil Service Careers Center ("NCSCC") and hired

Vaughan to manage the business, a position that he maintained from 1999 to 2002.  (Bailin Dep.

at 56, 63, 71)

In January or February of 2000, Bailin and Vaughan began discussing the creation

of a new entity that would train candidates for more advanced levels of government service.

(Bailin Dep. at 84)  Bailin retained counsel to form a new corporation, USCC, that would pro-

vide these services.  (Bailin Dep. at 86-87)

Much of the present lawsuit focuses upon a single conversation between Bailin

and a member of the Gold Firm that occurred prior to the creation of USCC.  On April 26, 2000,

Bailin spoke over the telephone for approximately two to three minutes with Edward Plasky about the possibility of using the Gold Firm's services for USCC. (Bailin Dep. at 97-102) During the phone conversation, Plasky told Bailin that he had known Vaughan for fifteen years, that the Gold Firm had been the accountant for Vaughan's business ventures during that time, and that the Gold Firm had prepared Vaughan's personal tax returns during that time as well. (Bailin Dep. at 109-10, 113; Plasky Dep. at 8, 15) Bailin recalled Plasky saying that Vaughan was a "good partner". (Bailin Dep. at 113-14) Bailin testified that he could not remember what specific work Plasky anticipated the Gold Firm would do for USCC, but that he believed that this would involve "normal accounting procedures". (Bailin Dep. at 115, 118)

This was the only conversation Bailin had with anyone from the Gold Firm prior to the creation of USCC. (Bailin Dep. at 97) Specifically, Bailin thought that calling Vaughan a "good partner" meant that he "was a good guy, . . . knows what is doing, . . . has been successful." (Bailin Dep. at 113-14) In addition, Bailin interpreted Plasky's statements about the Gold Firm's likely role with USCC to mean that the Gold Firm would be "monitoring" USCC as a "watchdog", and thus "protecting both partners". (Bailin Dep. at 112, 114-15, 172-73) He also interpreted Plasky's comments as meaning that Vaughan was "credible". (Bailin Dep. at 113-14) Bailin testified that he understood this to be the Gold Firm's expected role because that was what he understood as the role of his own accountant. (Bailin Dep. at 173) On April 28, 2000, Bailin and Vaughan executed an agreement providing for the manner in which USCC would be financed and operated. (Def. Ex. H) Bailin became a 30% shareholder of the newly formed USCC. (Def. Ex. I at 2)

TELG placed advertising for USCC and received payments for most of the services it billed. (Def. Ex. J) Every two or three months, Vaughan provided Bailin with handwrit-

ten financial statements pertaining to the business of both USCC and NCSCC. (Bailin Dep. at 134-36) Bailin acknowledges that there was nothing on the face of these statements connecting them to the Gold Firm and that he never inquired into the source of the statements. (Bailin Dep. at 135-36) Plasky testified – and Bailin does not dispute – that the Gold Firm's work for USCC included summarizing receipt disbursements and preparing bank reconciliations and tax returns. (Plasky Dep. at 118) However, Bailin never received or requested any documents or communication with the Gold Firm. (Bailin Dep. at 132-33, 135-36, 162)

In early 2001, Vaughan was charged in federal court in Kansas with four counts of criminal contempt, inter alia, for violating the District of Kansas permanent injunction in connection with his involvement with GCC. See United States v. Vaughan, 119 Fed. Appx. 227, 229 (10th Cir. 2004), cert. denied 2005 WL 2035064, *1 (U.S. Oct. 3, 2005) (providing background). He was separately charged with conspiracy to commit wire fraud and money laundering. See id.

In the fall of 2001, Bailin became aware that the New York City Department of Consumer Affairs was investigating USCC. (Bailin Dep. at 162) Bailin asked Vaughan about the New York investigation, but Vaughan responded that it related to an ongoing investigation and litigation concerning a Kansas-based business. (Bailin Dep. at 162) Vaughan told Bailin that he "expected a slap on the wrist and a minor fine." (Bailin Dep. at 162) Although Bailin recalls asking more questions of Vaughan, Vaughan apparently "fluffed it off" and said, "it was really nothing". (Bailin Dep. at 163) Bailin did not follow up on this conversation with an investigation of his own. (Bailin Dep. at 163) Specifically, Bailin did not contact the Gold Firm to discuss the financial health of USCC or any other matters. (Bailin Dep. at 132-33, 135-36, 162)

Vaughan continued to manage both USCC and NCSCC for several months.

(Bailin Dep. at 162) Bailin finally severed his relationship with Vaughan in early 2002 when Bailin discovered credit card charges that were not reflected on the financial statements provided by Vaughan. (Bailin Dep. at 162) After guilty pleas, Vaughan was eventually sentenced to 84 months in prison. See Vaughan, 119 Fed. Appx. at 229-30.

Plaintiffs filed their complaint in this case on March 5, 2003. Although plaintiffs assert other claims against other defendants, the essence of plaintiffs' claims is that (1) the Gold Firm failed to inform plaintiffs about the Kansas-based investigation during the April 26, 2000, phone conversation; and (2) the Gold Firm failed to inform plaintiffs about this investigation and Vaughan's alleged mismanagement of USCC after the Gold Firm was hired to perform accounting services for USCC.

Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, thus demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth

specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed. R. Civ. P. 56(e). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Fed. R. Civ. P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. Id. When cross-motions for summary judgment are made, the standard is the same as that for an individual motion. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

Discussion

In their complaint, plaintiffs assert six claims against the Gold Firm: fraud, breach of contract, breach of fiduciary duty, constructive fraud, negligent misrepresentation and professional negligence. While not alleged in the complaint, I also consider a third-party beneficiary of contract theory because planitiffs' briefs discuss such a claim. All of these claims arise from two analytically distinct time periods: (1) the period prior to Bailin's investment in USCC, and (2)

the period during which Bailin was a 30% shareholder of USCC.  I will evaluate each of the claims in the context of these two time periods.

I.      Fraud

In order to state such a claim in New York, a plaintiff must prove: "(1) a misrep-resentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996)). "[U]nder New York law, each element of a fraud claim must be proven by clear and convincing evidence."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 784-5 (2d Cir. 2003) (citing Hutt v. Lumbermens Mut. Cas. Co., 95 A.D.2d 255, 256-57 (2d Dep't 1983)).

Defendant has limited its motion for summary judgment to the assertion that there is no evidence from which a reasonable jury could find in plaintiffs' favor on the issue of reasonable reliance.  (Def. Mem. of Law at 16-20)  Plaintiffs, in turn, have moved for summary judgment in their favor on the fraud claim and thereby have placed in issue all ele-ments of that claim.  (Pl. Mem. of Law in Opp'n at 31-32)  In such circumstances, a court may search the record for any evidence to support the elements of a claim and grant summary judgment to the non-movant in the absence of such evidence.  See Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am., 419 F.3d 181, 190-191 (2d Cir. 2005) ("Sum-mary judgment in favor of the non-movant can be particularly appropriate where, as here, the factual record has been 'fully developed.'"); Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991).  In this case, I conclude that the plaintiff has failed to come forward with evidence from which a reasonable jury could find in its favor on either the first

or second elements of a fraud claim.

To satisfy the first element, the defendant's false statements must be "representations of present fact". See Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992) (citing Deerfield Commun. Corp. v. Chesebrough-Pond's Inc., 68 N.Y.2d 954, 956 (1986)). "No fraud action may be grounded on a mere expression of opinion." Schuster v. City of New York, 5 N.Y.2d 75, 96 (1958). Cf. DiGiulio v. Robin, 2003 WL 21018828, *3 (S.D.N.Y. May 6, 2003) ("[M]ere expressions of opinion or commendatory trade talk, and when such is the case, they do not constitute fraud . . . ."). Plaintiffs concede that the only communication between either of the plaintiffs and the Gold Firm was the April 26, 2000, phone conversation between Bailin and Plasky. (Bailin Dep. at 132-33, 135-36, 162) This conversation is the only occasion on which the Gold Firm could possibly have committed fraud against plaintiffs because this was the only interaction between the parties of any kind.

In support of their motion for summary judgment, plaintiffs have produced no evidence from which a reasonable jury could conclude that Plasky misrepresented any factual matter to Bailin or TELG. Plasky represented several facts to Bailin, including the length and nature of his working relationship with Vaughan. (Bailin Dep. at 109-10, 113) However, plaintiffs do not allege that any of these statements were false. (Pl. Mem. of Law in Opp'n at 29-32) Plaintiffs do not claim that Plasky ever affirmatively represented to Bailin that Vaughan was free of any legal problems. (Bailin Dep. at 97-102, 109-10, 113-15, 118) Rather, plaintiffs identify two alleged statements by Plasky that they argue constitute false representations of fact by the Gold Firm. First, plaintiffs point to Plasky's alleged statement that Vaughan was a "good partner". (Pl. Repl. Mem. of Law ¶ 23; Bailin Dep. at 113-14) Calling Vaughan a "good partner" or "credible" cannot be reasonably viewed as anything

more than Plasky's personal opinion of Vaughan.  As a matter of law, such an opinion –

without more – is not actionable as fraud.  See Schuster, 5 N.Y.2d at 96; DiGiulio, 2003 WL

21018828, at *3.  In addition, plaintiffs contend in their briefs that Plasky's alleged promise

to serve as a "watchdog" over USCC was a false representation of fact.  (Pl. Repl. Mem. of

Law ¶ 23)  However, Bailin conceded in his deposition that Plasky never actually promised

to serve in such a capacity, but rather only allegedly promised to perform what was vaguely

described as "normal accounting procedures".  (Bailin Dep. at 112, 114-115, 118, 172-73)

Given the accounting work actually performed by the Gold Firm for USCC, this statement

cannot also not be reasonably considered a false representation of fact.  (Plasky Dep. at 118)

As a result, plaintiffs have failed to produce from which a reasonable jury could find in their

favor on the first element of their fraud claim.

      Plaintiffs have also failed to satisfy the second element of a fraud claim – the

defendant's knowledge that its statements were false.  See Wynn, 273 F.3d at 156.  This

knowledge must exist at the time the statements were made.  See Abrahami v. UPC Constr.

Co., 224 A.D.2d 231, 232-33 (1st Dep't 1996).  The "mere negligent failure to acquire

knowledge of the falsehood is not sufficient . . . ."  Id. at 234 (citing Marine Midland Bank v.

Russo Produce Co., 50 N.Y.2d 31, 44 (1980)).

      In support of their motion for summary judgment, plaintiffs have failed to

come forward with evidence from which a reasonable jury could find that Plasky – or anyone

else at the Gold Firm – knew about the Kansas injunction against Vaughan at the time of this

conversation.  Plasky testified – and plaintiffs offered no contrary evidence – that he did not

learn about the injunction until August or September of 2002.  (Plasky Dep. at 34)  Bailin's

strongly held and conclusory belief that the Gold Firm must have known of Vaughan's legal

troubles in April of 2000 does not supplant the need for evidence. (Bailin Dep. at 156-58)

Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will

not defeat summary judgment." <u>Kulak v. City of New York</u>, 88 F.3d 63, 71 (2d Cir. 1996)

(citing <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (1986)). <u>See also</u> <u>Anderson</u>, 477 U.S. at

249-50 (noting that summary judgment should be granted if the evidence is "merely color-

able" or "not significantly probative"). In addition, a "plaintiff opposing a motion for sum-

mary judgment . . . cannot rely upon the hope that somehow, on cross-examination of the de-

fendant's witnesses, he can establish his case." <u>McGovern v. Local 456, Int'l Bhd. of Team-</u>

<u>sters, Chauffeurs & Warehousemen & Helpers of Am.</u>, 107 F. Supp. 2d 311, 320 (S.D.N.Y.

2000). Rather, a plaintiff in New York must come forward with "clear and convincing" evi-

dence to support each element of a fraud claim, and these plaintiffs have failed to do so. <u>See</u>

<u>Dallas Aerospace</u>, 352 F.3d at 784-85. Despite ample opportunity to conduct discovery,

plaintiff has failed to come forward with any evidence that the Gold Firm knew of any alle-

gation of unlawful conduct by Vaughan. The absence of such evidence is fatal to their fraud

claim.

 Finally, in response to defendant's motion, plaintiffs have produced no evi-

dence upon which a reasonable jury could conclude that any reliance on their part was rea-

sonable. During the two to three minute phone conversation on April 26, 2000, Plasky alleg-

edly called Vaughan a "good partner" and informed Bailin that the Gold Firm would perform

"normal accounting procedures". (Bailin Dep. at 112-15, 118, 172-73) New York courts

have rejected assertions of reasonable reliance that rest on such vague bases. <u>See</u>, <u>e.g.</u>,

<u>Morgenthow & Latham v. Bank of N.Y. Co.</u>, 305 A.D.2d 74, 81 (1st Dep't 2003) (holding

that plaintiff's reliance on defendant's status as a respected financial institution, without

more, is not reasonable for purposes of fraud claim). Cf. Cohen v. Wales, 133 A.D.2d 94, 95 (2d Dep't 1987) (holding that the "mere recommendation of a person" who later injures another cannot form the basis for a negligence claim against the recommender). Moreover, plaintiffs here could have easily followed up on this brief conversation to get more information before investing. See Fitch v. TMF Sys., 272 A.D.2d 775, 778 (3d Dep't 2000) (stating that plaintiff's capacity to have inquired more before investing was a factor in concluding that plaintiff did not reasonably rely on alleged misrepresentations). Finally, Bailin was a "relatively sophisticated investor[] who should have understood the risks of investing . . . without conducting a 'due diligence' investigation or consulting [his own] lawyers and accountants." Stuart Silver Assocs. v. Baco Dev. Corp., 245 A.D.2d 96, 99 (1st Dep't 1997) (reversing trial court's denial of summary judgment on fraud claim, in part, because plaintiffs had failed to establish reasonable reliance).

With regard to the period after plaintiff Bailin invested in USCC, plaintiffs can assert no claim of fraud because they then had no communication whatsoever with defendant. (Bailin Dep. at 132-33, 135-36, 162) To the extent that any claim of fraud rests upon an asserted duty of the Gold Firm to affirmatively speak during this period, such a claim is analyzed as a potential claim for breach of fiduciary duty or constructive fraud. See Venezia v. Coldwell Banker Sammis Realty, 270 A.D.2d 480, 482 (2d Dep't 2000) (holding that plaintiff may not maintain a fraud claim in the absence of defendant's duty to speak).

Plaintiffs have had a full and fair opportunity to conduct complete and thorough discovery on the fraud claim. I extended the fact discovery period by one month at the request of plaintiff's counsel. (Docket Entry, No. 54) In response to defendant's motion, plaintiffs have failed to produce any evidence to create a genuine issue of material fact with regard to the rea-

sonable reliance element of a fraud claim. Plaintiffs have failed to produce any evidence that the Gold Firm misrepresented a present fact to plaintiffs; nor have they produced any evidence that Plasky or the Gold Firm knew any statement Plasky made to be false.

II.     Breach of Contract

The second claim asserted against the Gold Firm is for breach of contract. Under New York law, a plaintiff alleging a breach of contract must set forth the specific terms of the agreement, the consideration, the performance by plaintiffs, and the basis of the alleged breach of the agreement by the defendant. See Suthers v. Amgen, Inc., 372 F. Supp. 2d 416, 423 (S.D.N.Y. 2005) (citing Furia v. Furia, 116 A.D.2d 694, 695 (2d Dep't 1986)). To have a valid, enforceable contractual obligation, there must be a meeting of the minds between the contracting parties. I.G. Second Generation Partners, L.P. v. Duane Reade, 17 A.D.3d 206, 208 (1st Dep't 2005) (citing Miller v. Schloss, 218 N.Y. 400, 406 (1916)).

In this case, plaintiffs contend that a contract existed between either or both plaintiffs and the Gold Firm. (Pl. Mem. of Law in Opp'n at 22) For this claim, such a contract could only have existed after the April 26, 2000, phone conversation between Bailin and Plasky because that was the first, and only, communication or interaction between one of the plaintiffs and the Gold Firm. In other words, this phone conversation was the only opportunity for the parties to reach the mutual assent required for the formation of a contract. See Maas v. Cornell Univ., 94 N.Y.2d 87, 93-94 (1999) (noting that such assent may manifest itself in the form of a promise made or performance begun).

Plaintiffs have offered no evidence that either of them or the Gold Firm – expressly or impliedly – made any bargain, promise or agreement of any kind during the April 26, 2000, conversation. Bailin testified that neither he nor TELG ever retained the Gold Firm to

provide accounting services. (Bailin Dep. at 132) Yet, plaintiffs argue that clients usually "engage" accounting firms rather than retain them. (Pl. Mem. of Law in Opp'n at 22) Putting aside the significance of this purported distinction, it does not substitute for evidence that plaintiff reached an agreement with the Gold Firm to provide services. Bailin also contends that he had always understood – in his own mind – that the Gold Firm would be "monitoring" USCC and would be "protecting" both him and Vaughan from each other and a contract thus arose once Plasky spoke on Vaughan's behalf. (Bailin Dep. at 168-69, 171-74) However, in his deposition testimony, Bailin did not actually recall Plasky making such promises during their phone conversation. (Bailin Dep. at 114-16) Unilateral and subjective beliefs of one party, without more, do not establish a bilateral meeting of the minds. (Bailin Dep. at 97-102) See Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146 (3d Dep't 1992). See also Di Giulio v. City of Buffalo, 237 A.D.2d 938, 939 (4th Dep't 1997).

Plaintiffs, alternatively, argue that this Court should conclude that an implied contract existed between one or both of them and the Gold Firm. (Pl. Mem. of Law in Opp'n at 24-25) New York has long recognized that a bilateral understanding underlying a contract need not be expressed, but may instead be implied in fact. Miller, 218 N.Y. at 406-07. However, an implied-in-fact contract still "requires such elements as consideration, mutual assent, legal capacity and legal subject matter . . . ." Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 n.5 (2d Cir. 2000) (quoting Maas, 94 N.Y.2d at 93-94). Viewing the facts in the light most favorable to the plaintiffs, all that can be reasonably inferred from the brief phone conversation between Bailin and Plasky is that one was making a gratuitous inquiry of the other for information about Vaughan. There is no evidence of Bailin promising any present or future consideration to the Gold Firm. (Bailin Dep. at 111-18) Thus, no implied-in-fact contract was created.

See Maas, 94 N.Y.2d at 94 (rejecting the claim that an implied-in-fact contract existed where defendant's conduct evinced no intent to enter into a contract).

Finally, plaintiffs argue that this Court should conclude that Bailin and Vaughan were partners *inter sese* and thus should disregard the corporate form of USCC. (Pl. Mem. of Law in Opp'n at 23) The cases cited by plaintiffs for this proposition pertain to joint venture agreements in which the partners agreed to retain certain partnership-based rights between themselves, yet held themselves out as a corporation as to the rest of the world. See, e.g., Sagamore Corp. v. Diamond West Energy Corp., 806 F.2d 373, 379 (2d Cir. 1986) (citing Weisman v. Awnair Corp. of Am., 3 N.Y.2d 444 (1957)). However, in this case, plaintiffs have offered no evidence that Bailin and Vaughan retained any such rights that would be relevant to the contract between USCC and the Gold Firm. Rather, Bailin and Vaughan pooled their resources to form a corporation, and Bailin obtained a 30% stake in the new entity. (Def. Ex. I at 2) Viewing the evidence in the light most favorable to plaintiffs, Bailin was an investor in a corporation that, in turn, contracted with a third-party, the Gold Firm. There is no support in New York law for the proposition that such a relationship gives rise to an express or implied contract between the investor and the third-party.

Placed in the simplest of terms and drawing all reasonable inferences in plaintiffs' favor, no reasonable fact-finder could find that the elements necessary for the formation of an express or implied contract between either plaintiff and the Gold Firm exists under New York law. Defendant is entitled to summary judgment in its favor.

III.     Breach of Fiduciary Duty

Plaintiffs also argue that the Gold Firm breached a fiduciary duty owed to them. A fiduciary relationship arises "where one [person] is under a duty to act for or to give advice for

the benefit of another upon matters within the scope of the relations." <u>Flickinger v. Harold C. Brown & Co.</u>, 947 F.2d 595, 599 (2d Cir. 1991) (citing <u>Mandelblatt v. Devon Stores, Inc.</u>, 132 A.D.2d 162, 168 (1st Dep't 1987)). <u>See also</u> Restatement [Second] of Torts § 874, comment a. "It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." <u>Official Comm. of Unsecured Creditors ex rel. SmarTalk Teleservices, Inc. Bankr. Estate v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 2002 WL 362794, *9 (S.D.N.Y. Mar. 6, 2002) (quoting <u>Penato v. George</u>, 52 A.D.2d 939, 942 (2d Dep't 1976)). "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." <u>WIT Holding Corp. v. Klein</u>, 282 A.D.2d 527, 529 (2d Dep't 2001) (citations omitted).

       Despite this broad standard, New York has restricted the circumstances permitting a finding of a fiduciary duty. At a minimum, a plaintiff must plead or prove facts demonstrating a "relationship approaching privity." <u>See</u>, <u>e.g.</u>, <u>Doe v. Holy See (State of Vatican City)</u>, 17 A.D.3d 793 (3d Dep't 2005) (no relationship between church member and the Vatican); <u>Columbia Mem. Hosp. v. Barley</u>, 16 A.D.3d 748, 749 (3d Dep't 2005) (no relationship between hospital and government social services agency). Whether a relationship is fiduciary in nature must be determined on the basis of the services agreed to by the parties. <u>Northeast Gen. Corp. v. Wellington Adver.</u>, 82 N.Y.2d 158, 163 (1993). In New York, the accountant-client relationship is not fiduciary in nature absent special circumstances, such as the accountant's commission of active fraud on the client. <u>VTech Holdings Ltd. v. Pricewaterhouse Coopers LLP</u>, 348 F. Supp. 2d 255, 268 (S.D.N.Y. 2004) (citing <u>DG Liquidation, Inc. v. Anchin, Block & Anchin, LLP</u>, 300 A.D.2d 70, 71 (1st Dep't 2002)).

Plaintiffs have failed to come forward with admissible evidence from which a reasonable fact-finder could conclude that a fiduciary relationship existed between either of them and the Gold Firm. No fiduciary duty could have existed prior to the phone conversation between Bailin and Plasky because they had no relationship whatsoever until that point. (Bailin Dep. at 97-98) See Flickinger, 947 F.2d at 599. After the conversation, neither Bailin nor TELG became a client of the Gold Firm because neither party retained the Gold Firm for its services. (Bailin Dep. at 132) Rather, once created, USCC was a client of the Gold Firm. Bailin was a major investor in USCC, but he concedes that he did not rely on any work product of the Gold Firm during its engagement by USCC. (Bailin Dep. at 132-33, 135-36, 162) New York courts have held that shareholders of a corporation do not have a fiduciary relationship with the corporation's accounting firm. See, e.g., Tal v. Superior Vending, LLC, 20 A.D.3d 520, 521 (2d Dep't 2005) (finding no relationship between accountant and a 50% shareholder); Hamer v. Chessman, 129 A.D.2d 491, 492 (1st Dep't 1987) (same). With only its ordinary advertising contract with USCC, TELG had even less of a connection to the Gold Firm than did Bailin.

No reasonable jury could find the existence of a fiduciary relationship between plaintiffs and the Gold Firm or the breach thereof. Defendant Gold Firm is entitled to judgment as a matter of law.

IV.     Constructive Fraud

Plaintiffs also claim that defendant is liable to them on a constructive fraud theory. The First Department recently restated this doctrine:

> Under the doctrine of constructive fraud, where a fiduciary relationship existed between two parties such that they were dealing on unequal terms due to one party's weakness, dependence or trust justifiably reposed upon the other and unfair advantage is rendered probable, "the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair,

open, voluntary and well understood."

Mazza v. Fleet Bank, 16 A.D.3d 761, 762 (1st Dep't 2005) (quoting Matter of Gordon v. Bialystoker Ctr. & Bikur Cholim, 45 N.Y.2d 692, 699 (1978)). Thus, a claim for constructive fraud requires that there have existed a "confidential or fiduciary relationship between the parties." Klembczyk v. Di Nardo, 265 A.D.2d 934, 935 (1st Dep't 1999). See also Republic of Croatia v. Tr. of Marquess of Northampton 1987 Settlement, 203 A.D.2d 167, 168 (1st Dep't 1994), lv. to appeal denied, 84 N.Y.2d 805 (1994). In their brief, plaintiffs acknowledge this requirement. (Pl. Mem. of Law in Opp'n at 28) Such a relationship must have arisen before the transaction complained of, and it cannot be formed merely by a plaintiff's subjective decision to repose trust in the defendant. See Kolari v. N.Y. Presbyterian Hosp., 382 F. Supp. 2d 562 (S.D.N.Y. 2005) (citing SNS Bank, N.V. v. Citibank, N.A., 7 A.D.3d 352, 355-56 (1st Dep't 2004)).

As discussed above, neither plaintiff here had a fiduciary relationship with the Gold Firm either prior to or after Bailin invested in USCC. Thus, their claim for constructive fraud fails as a matter of law. Therefore, defendant is entitled to summary judgment in its favor on this claim.

V.      Negligent Misrepresentation

The fifth claim asserted by the plaintiffs is for negligent misrepresentation. In New York, a claim for negligent misrepresentation normally has five elements: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) upon which they did act or failed to act; (4) to their damage; and that (5) the declarant expressed the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care. Dallas Aerospace, 352 F.3d at 788 (citing White v. Guarente, 43 N.Y.2d 356 (1977)). "[L]iability for negligent misrepresentation has been imposed only on those per-

sons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996).

In response to defendant's motion, plaintiffs have failed to come forward with any evidence from which a properly instructed jury could find the existence of a type of relationship that New York requires as a necessary element of such a claim. In particular, plaintiffs have not shown that they had either a contractual or fiduciary relationship with the Gold Firm, and neither plaintiff had entered a relationship of "confidence and trust" with the Gold Firm prior to their involvement with USCC. As discussed in the context of fiduciary duty, neither plaintiff entered into such a relationship after Bailin invested in USCC. However, even if this Court were to conclude otherwise, plaintiffs would still fail to establish a claim for negligent misrepresentation under this test because the Gold Firm never imparted any words to one of them during that period. (Bailin Dep. at 132-33, 135-36, 162) See Dallas Aerospace, 352 F.3d at 788. Finally, the Gold Firm did not possess any specialized knowledge about the fact that Vaughan was the subject of a government investigation because such knowledge was publicly available. See, e.g., Def. Ex. K (collecting Federal Trade Commission press releases from 1997 and 1998 discussing Vaughan investigation).

In limited circumstances, New York recognizes a negligent misrepresentation claim against an accountant on behalf of certain plaintiffs who lack contractual privity with the defendant accountant. There are three elements to such a claim: "(1) the accountant must have been aware that the reports would be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) some conduct by the accountant 'linking' him or her to that known party." Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 75 (2d Cir.

2000) (citing <u>Credit Alliance Corp. v. Arthur Andersen & Co.</u>, 65 N.Y.2d 536, 554 (1985)).

Conduct constitutes "linking conduct" if it is "some form of direct contact between the account-

ant and the plaintiff, such as face-to-face conversation, the sharing of documents, or other 'sub-

stantive communication' between the parties." <u>Id.</u> at 75 (citing <u>Prudential Ins. Co. v. Dewey,

Ballantine, Bushby, Palmer & Wood</u>, 80 N.Y.2d 377, 385 (1992)).  In reviewing New York au-

thorities, the Second Circuit has characterized this kind of negligent misrepresentation claim as

imposing a "heavy burden" for the plaintiff.  <u>Id.</u> at 73.  Such a "strict limitation on the class of

potential plaintiffs represents a policy determination by the New York courts that accountants

will not, merely by contracting with a particular client, expose themselves 'to a liability in an in-

determinate amount for an indeterminate time to an indeterminate class.'"  <u>Id.</u> at 74 (quoting <u>Ul-

tramares Corp. v. Touche</u>, 255 N.Y. 170, 179 (1931) (Cardozo, C.J.)).

   In <u>Sec. Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co.</u>, 79 N.Y.2d 695

(1992), the New York Court of Appeals found no liability on the part of the accountant where the

accountant neither provided nor agreed to provide a copy of the audit report directly to the plain-

tiff, did not mention the plaintiff in its audit engagement letter with the client, and had demon-

strated no awareness that the audit would primarily benefit the plaintiff.  <u>Id.</u> at 706.  Although the

plaintiff lender had spoken with the accountant once, the Court found this contact insufficient to

establish liability.  <u>Id.</u> at 705.  The Court of Appeals rejected the notion that, with one phone call,

the plaintiff could "create such an extraordinary obligation" on the defendant's part.  <u>Id.</u>  <u>See</u> <u>also</u>

<u>CMNY Capital, L.P. v. Deloitte & Touche</u>, 821 F. Supp. 152, 161 (S.D.N.Y. 1993) (finding no

"linking conduct" where the accountant's client had made one phone call informing the account-

ant that the plaintiffs, investors in the client corporation, would be relying on the audit report).

   Here, as in <u>Sec. Pac. Bus. Credit</u>, the only concrete communication between

plaintiffs and the Gold Firm was a two to three minute phone conversation between Bailin and Plasky. (Bailin Dep. at 132-36, 162) This conversation was not the kind of "substantive communication", such as one relating to an audit of USCC or any other business, that would support a theory of liability. See Sec. Investor Prot. Corp., 222 F.3d at 75 (collecting cases). Rather, Bailin sought and Plasky provided only the most general opinion of Vaughan as a businessperson, as well as a description of the extent of Plasky's relationship with Vaughan. (Bailin Dep. at 109-10, 113-14) "Where direct contact between the accountant and the plaintiff has been nonexistent or even minimal . . . , the plaintiff cannot recover for negligence." Sec. Investor Prot., 222 F.3d at 74.

In this case, the Gold Firm was not asked to prepare nor did in fact prepare any reports, formal or informal, for Bailin or TELG. Although the record is not clear about what documentation the Gold Firm produced during its work for USCC, Bailin testified that he neither received nor requested any documents or reports from the Gold Firm, even as his doubts about Vaughan grew. (Bailin Dep. at 132-33, 135-36, 162)

No reasonable jury could find in plaintiffs' favor on their claim for negligent misrepresentation, and defendant is entitled to judgment as a matter of law in its favor.

VI.     Professional Negligence

Plaintiffs next claim that the defendant Gold Firm is liable for professional negligence or malpractice. "Under New York law, accountants owe a duty of care only to (a) those with whom they have contracted, and (b) those with whom they have a 'relationship so close as to approach that of privity.'" BCH Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 984 (S.D.N.Y. 2003) (quoting Parrott v. Coopers & Lybrand, 95 N.Y.2d 479, 483 (2000)). See generally Ultramares, 255 N.Y. at 182-83. As discussed above, plaintiffs have

failed to demonstrate that they had a contractual relationship with defendant Gold Firm.

To establish that there was a relationship with defendant Gold Firm that was "so close as to approach that of privity," plaintiffs must satisfy a three-part test:

(1)     the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes;

(2)     in the furtherance of which a known party or parties was intended to rely; and

(3)     there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

See BCH Interim Funding, 283 F. Supp. 2d at 984 (citing Credit Alliance, 65 N.Y.2d at 551).

In Credit Alliance, the New York Court of Appeals affirmed the Supreme Court's grant of defendant's motion to dismiss a malpractice claim brought by a lender who had extended credit to a business, largely due to an erroneous audit conducted by the defendant accounting firm. 65 N.Y.2d at 541-42. The Court of Appeals found that the plaintiff had alleged insufficient "linking" conduct to the defendant accounting firm. Id. at 554-55. In both Credit Alliance and Sec. Pac. Bus. Credit, the plaintiffs were able to argue that they had relied on actual financial reports produced by the defendant. Here, Bailin conceded that defendant prepared no such reports on which plaintiffs relied. (Bailin Dep. at 132-33, 135-36, 162)

Plaintiffs also argue that the Gold Firm owed certain duties under New York law to them as third parties. (Pl. Mem. of Law in Opp'n at 31) In support, plaintiffs cite a line of decisions imposing liability on accounting firms for their false statements to third parties:

A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who

rely on the balance sheet.  Heedlessness and reckless disregard of consequence
may take the place of deliberate intention.

Curiale v. Peat, Marwick, Mitchell & Co., 214 A.D.2d 16, 28 (1st Dep't 1995) (quoting State St.
Trust Co. v. Ernst, 278 N.Y. 104, 112 (1938)).  These decisions merely restate the settled princi-
ple that accountants in New York, in performing an audit for a client, may be liable to third par-
ties when they conduct their audit with gross negligence or with blindness to the obvious.  See
Ultramares, 255 N.Y. at 190.

In considering this theory, it is important to observe that the accountant-client re-
lationship here at issue is the one between the Gold Firm and USCC.  (Pl. Mem. of Law in Opp'n
at 25)  This theory requires some kind of communication to have been made by the accounting
firm, and a failure to speak will not suffice.  See Curiale, 214 A.D.2d at 28.  Plaintiff concedes
that he never requested nor received any documents or communications with the Gold Firm be-
yond his brief phone conversation with Plasky.  (Bailin Dep. at 132-33, 135-36, 162)  Plaintiff
cannot recover on this theory.

In response to defendant's motion, plaintiffs have failed to come forward with
evidence from which a reasonable jury could find in their favor on their claim for professional
negligence.  Defendant is entitled to judgment as a matter of law.

VII.    Liability to Third-Party Beneficiaries

While not explicitly asserted in their complaint, plaintiffs also vaguely assert a
theory of liability premised upon a violation of their alleged rights as third-party beneficiaries
to the contract between USCC and the Gold Firm, or alternatively the contract between
Vaughan and the Gold Firm.  (Pl. Mem. of Law in Opp'n at 22-25)  In New York, a "party
asserting rights as a third-party beneficiary must establish (1) the existence of a valid and
binding contract between other parties, (2) that the contract was intended for his or her bene-

fit, and (3) that the benefit to him or her is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." BDG Oceanside, LLC v. RAD Terminal Corp., 14 A.D.3d 472, 473 (2d Dep't 2005), lv. to appeal dismissed, 5 N.Y.3d 783 (2005) (citing State of California Pub. Employees' Retirement Sys. v Shearman & Sterling, 95 N.Y.2d 427, 434-435 (2000)). Prior to Bailin's investment, USCC did not exist and thus had no contractual relationship with the Gold Firm. Therefore, neither Bailin nor TELG could yet be deemed a third-party beneficiary. Although Vaughan's contractual relationship with the Gold Firm had existed for several years before the Bailin-Plasky conversation, there is no evidence that either Bailin or TELG was an intended beneficiary of that contract.

After Bailin invested in USCC, the latter formed a contractual relationship with the Gold Firm and thus the possibility of third-party beneficiaries first arose. "[A]n intended beneficiary need not be specifically mentioned in the contract . . ., [but] New York law requires that the parties' intent to benefit a third party be shown on the face of the contract." Fireman's Fund Ins. Co. v. Glass, 1997 WL 289858, *3 (S.D.N.Y. May 30, 1997) (citing Strauss v. Belle Realty Co. 98 A.D.2d 424, 426-27 (2d Dep't 1983), aff'd 65 N.Y.2d 399 (1985)). "Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent." LaSalle Nat'l Bank v. Ernst & Young LLP, 285 A.D.2d 101, 108-109 (1st Dep't 2001) (citing Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38 (1985)). Specifically, the party claiming third-party beneficiary status must show that "the circumstances indicate[d] that the promisee intend[ed] to give the beneficiary the benefit of the promised performance." Roosevelt Islanders for Responsible Southtown Dev. v. Roosevelt Island Operating Corp.,

291 A.D.2d 40, 57 (1st Dep't 2001), lv. to appeal denied, 97 N.Y.2d 613 (2002).

There is no evidence in the record from which a reasonable jury could conclude that USCC and the Gold Firm ever intended their contract to benefit TELG, the company that USCC would eventually hire to provide advertising. True, businesses usually seek accounting or auditing services so that investors are independently informed about the business' financial status. Yet, even assuming arguendo that Bailin was an intended third-party beneficiary, plaintiffs have failed to offer any evidence upon which a reasonable fact-finder could conclude that the Gold Firm breached its obligations under its contract with USCC. Plaintiffs have not provided this Court with an engagement letter between the Gold Firm and USCC detailing those obligations, and Plasky testified that no such letter ever existed. (Plasky Dep. at 118) Nor have the plaintiffs introduced evidence pertaining to the terms of whatever oral agreement existed between USCC – as represented by Vaughan – and the Gold Firm. Viewing the facts in the light most favorable to the plaintiff, the most that can be said is that USCC hired the Gold Firm to perform "normal accounting procedures". (Bailin Dep. at 115, 118) Bailin interpreted this description of the arrangement between USCC and the Gold Firm to require the latter to be "monitoring" USCC as a "watchdog" and thus "protecting both partners". (Bailin Dep. at 112, 114-15, 172-73) However, Bailin's subjective and unilateral interpretation of a contractual arrangement to which he was not a party, without more, cannot form the basis for his third-party beneficiary status. Cf. Murray Walter, 183 A.D.2d at 146; Di Giulio, 237 A.D.2d at 939.

As with the claims explicitly asserted in the complaint, plaintiffs have failed to come forward with evidence from which a reasonable fact-finder could conclude that defendant Gold Firm breached its contract with USCC to the detriment of plaintiff Bailin. If plaintiffs had asserted a claim for breach as a third-party beneficiary (and the complaint does not appear to as-

sert such a claim), defendant would be entitled to judgment as a matter of law. (FAC ¶¶ 63-72)


CONCLUSION

For the reasons set forth above, defendant Gold Firm's motion for summary judgment is GRANTED as to all claims asserted against it in this action. The plaintiffs' cross-motion for summary judgment is DENIED.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
October 26, 2005

26